## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

MICHAEL HENDERSON,

     Petitioner,

v.                                  Case No. 8:21-cv-167-WFJ-SPF

SECRETARY, DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____/

## ORDER

     Mr. Henderson, a Florida prisoner, filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 (Doc. 1). Respondent filed a response opposing the petition (Doc. 9), to which Mr. Henderson replied (Doc. 16). Upon consideration, the petition will be denied.

## I. Background and Relevant Procedural History

     Mr. Henderson was accused of sexual crimes against three young boys, D.M., A.D., and A.D.'s younger brother, for which he was charged with two counts of Lewd or Lascivious Molestation, one count of Lewd or Lascivious Battery, and one count of Capital Sexual Battery[1] (Doc. 9-2, Ex. 4).[2] D.M. and A.D., who lived with their respective mothers

---

[1] Count Two, the lewd or lascivious battery charge referring to A.D.'s younger brother, was nolle prossed before trial (Doc. 9-2, Ex. 5).

[2] For purposes of reference to pleadings and exhibits, the Court will cite the document page numbers assigned by the Court's electronic docketing system.

in the same apartment complex as Mr. Henderson, testified they were friends with Mr. Henderson's son Jed and were sexually abused by Mr. Henderson multiple times during visits at Mr. Henderson's apartment (*Id.*, Ex. 8 at 322-35, 392-403). D.M.'s mother testified that D.M. was friends with Mr. Henderson's son, D.M. slept over at Mr. Henderson's apartment many times, and Mr. Henderson made many phone calls to D.M. toward the end of their relationship (*Id.*, Ex. 8 at 360-67). A.D.'s mother, who was a nurse often working night shifts, testified to her initial romantic relationship with Mr. Henderson, which eventually ended, and her financial relationship with him in which she paid his bills in exchange for him watching her two boys while she was working (*Id.*, Ex. 8 at 424-42). Detective Hunt testified to the details of her investigation (*Id.*, Ex. 8 at 456-76). Finally, the State called Dr. Crum, a psychologist, to testify that there is a general pattern of male adolescent behavior when sexually abused, such as feeling personally responsible for the abuse, guilt, an unlikelihood to report, and shame for not stopping the abuse sooner (*Id.*, Ex. 9 at 491-500).

The defense called five witnesses. Melissa Ainsworth, Jed's mother, testified she knew all the boys involved and saw them frequently playing outside when she picked up Jed from Mr. Henderson's apartment every week (*Id.*, Ex.9 at 509-12). Jed, Timothy Bosse, and Robert Anderson essentially testified that they were frequently at Mr. Henderson's apartment during the relevant period, and they never saw or participated in any sexual activity (*Id.*, Ex. 9 at 486-507, 512-33; Ex.10 at 578-599). Finally, D.M. testified he sent an e-mail to Timmy in which he falsely stated he saw Mr. Henderson give Brandon oral sex (*Id.*, Ex. 9 at 553-55).

The jury found Mr. Henderson guilty as charged (*Id.*, Ex. 11). He was sentenced to 15

2

years in prison on the lewd or lascivious battery count and to life in prison on both the other two counts (*Id.*, Ex. 12). His convictions and sentences were affirmed on direct appeal. *Henderson v. State*, 109 So.3d 795 (Fla. 2d DCA 2013) [table]. And his petition for a writ of certiorari to the United States Supreme Court was denied (*Id.*, Ex. 21).

Mr. Henderson pursued post-conviction relief under Rule 3.850, Fla.R.Crim.P. (*Id.*, Exs. 22, 24, 26). The state post-conviction court summarily denied eight claims and ordered an evidentiary hearing on the remaining six claims (*Id.*, Ex. 29). After the evidentiary hearing (*id.*, Exs. 30-31), the remaining six claims were denied (*Id.*, Ex. 32). The denial of the Rule 3.850 motion was affirmed on appeal without a written opinion (*Id.*, Ex. 37).

Mr. Henderson filed a petition alleging ineffective assistance of appellate counsel, which was denied (*Id.*, Exs. 38-39). He filed a successive Rule 3.850 motion which was dismissed as untimely and, alternatively, denied on the merits (*Id.*, Exs. 40, 41). The dismissal/denial of the successive Rule 3.850 motion was affirmed on appeal (*Id.*, Ex. 42).

Mr. Henderson filed his federal petition for a writ of habeas corpus (Doc. 1) in which he raised five grounds for relief. He supplemented his petition with a sixth ground (Doc. 6). However, he then voluntarily dismissed the sixth ground (Docs. 15, 17).

## II. Standards of Review

### A. AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the Constitution or laws or

3

treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so

4

lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The state appellate court affirmed Mr. Henderson's convictions and sentences, as well as the denial of postconviction relief, without discussion. These decisions warrant deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir.2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

## B. Exhaustion of State Remedies; Procedural Default

A federal habeas petitioner must exhaust his claims in state court before presenting them in his federal habeas petition. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). The exhaustion requirement is satisfied if the petitioner fairly presents his claim in each appropriate state court and alerts that court to the federal nature of the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental

miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson*, 353 F.3d at 892.

### C. Ineffective Assistance of Counsel

Mr. Henderson alleges ineffective assistance of trial counsel.[3] Ineffective assistance of counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id*. at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id*. at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable

---

[3] During his criminal pre-trial and trial proceedings, Mr. Henderson was represented by multiple attorneys. However, he brings his claims of ineffective assistance against only three attorneys, one (Ground Five) against Donald O'Leary, and the remaining claims against his trial counsel Dwight Wells and Matthew Wells.

professional judgment." *Id*.

Mr. Henderson must show that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. To demonstrate prejudice, Mr. Henderson must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation and citations omitted); *see also Pooler v. Sec'y, Dep't of Corr.*, 702 F.3d 1252, 1270 (11th Cir. 2012) ("Because we must view Pooler's ineffective counsel claim—which is governed by the deferential *Strickland* test—through the lens of AEDPA deference, the resulting standard of review is doubly deferential."). "The question [on federal habeas review of an ineffective-assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

## III. Discussion

**Ground One: Trial counsel was constitutionally ineffective and upon three incidents of the States [sic] nondisclosure of material evidence deprived Petitioner a substantive or procedural right to which he was entitled as a matter of law. Thereby Petitioner was deprived of his constitutional rights to effective counsel, a fair trial, and due process in meeting the case of the State. (Doc. 1-1).**

Mr. Henderson contends trial counsel were ineffective in failing to move for a *Richardson* hearing[4] on the State's alleged discovery violations. Specifically, Mr. Henderson alleges that the State failed to disclose: 1) information that Mr. Henderson had shown child pornography to D.M.; 2) a recorded phone call between Mr. Henderson and D.M.; and 3) Detective Hunt's recorded interview with D.M. during which Detective Hunt threatened to incarcerate the victim if he refused to testify, and D.M. stated he initially lied to police. Finally, Mr. Henderson alleges he informed counsel about the phone call and contends they were ineffective in failing to investigate the call and introduce it at trial.

Following an evidentiary hearing, the state post-conviction court denied these claims as follows:

### Ground Four - Ineffective Assistance of Counsel for Failing to Investigate Evidence

Defendant alleges that counsel was ineffective for failing to obtain a copy of a controlled call that victim D.M. made to the Defendant. In her police report, Detective Hunt indicated that she made a controlled call and the Defendant alleges that handwriting on the police report indicated that counsel knew about the controlled call, but failed to investigate it further by obtaining a copy of the controlled call. The Defendant contends that he was prejudiced

---

[4] *See Richardson v. State*, 246 So.2d 771, 774-75 (Fla. 1971) (holding that a trial court must inquire into circumstances of the State's alleged failure to comply with discovery rules and determine whether any noncompliance prejudiced the defendant).

because Detective Hunt testified to the call at trial and said that the Defendant asked D.M., during the controlled call, to "make sure you rid of my number on there because they can always check and see - they can check phone records and see how often *I've* called," when the Defendant actually said "they ... can see how often *you've* called." (emphasis added). The Defendant contends that the controlled call was exculpatory and, if counsel had listened to the controlled call before trial, they would have been able to impeach Detective Hunt and D.M. and demonstrate that it was D.M. who had actually been calling the Defendant, not the other way around. The Defendant further contends that the State was able to elicit false testimony that the Defendant had made admissions during the call when, according to the Defendant, there were no admissions. The Defendant concludes that, but for counsel's failure to investigate the controlled call and impeach the witnesses by introducing the call at trial, a reasonable probability exists that the outcome of the trial would have been different.

*Summary of Evidentiary Hearing Testimony*

The parties stipulated to the admission of the controlled call, Exhibit #6, between victim D.M. and the Defendant, and played the controlled call during the evidentiary hearing. (*See Exhibit C: pp. 111-17*). During the controlled call, the Defendant told D.M. to "make sure you get rid of my number on there because they can always check and see - they can check phone records to see how often *you've* called." (emphasis added).

Dwight Wells testified that he knew that Defendant felt that the call was exculpatory, but did not recall whether he took steps to investigate the call. (*See Exhibit C: p. 124, lines 1-12*). Dwight Wells testified that, had he listened to the call before trial, it would have impacted his trial strategy. (*See Exhibit C: p. 129, lines 3-24*).

Matthew Wells testified that he did not know the controlled call existed until Detective Hunt testified to it at trial. (*See Exhibit C: pp. 146-48*). He did not depose Detective Hunt. (*See Exhibit C: pp. 147-48*). If he had been aware of the controlled call earlier, Matthew Wells would have cross-examined D.M. to establish that it was D.M. who was actually calling the Defendant. (*See Exhibit C: p. 149, lines 8-21*).

The Defendant testified that he never called D.M. and that he told D.M. to erase the calls to keep D.M. from getting in trouble. (*See Exhibit B: p. 159, lines 7-9; p. 160, lines 8-10*).

9

*Analysis of Ground Four*

Considering the facts and circumstances of this case, the Court finds that any impeachment of Detective Hunt or D.M. as to whether D.M. was calling the Defendant or the Defendant was calling D.M. would have been a detail without a distinction. The crux of the trial testimony is that the Defendant told D.M. to erase his phone history log to prevent the police from viewing his phone history, not to prove who called who. Considering that the Defendant knew that the children were being interviewed by police in connection with an investigation, asking D.M. to erase a phone history log indicates that the Defendant sought to conceal evidence, which is what the State argued in its closing argument. (*See Exhibit B: p. 601, lines 2-8*).

The Court further finds that the State did not present false testimony when Detective Hunt testified that the Defendant during the controlled phone call, "did not make a full on admission." (*See Exhibit B: pp. 439-41*). Having listened to the controlled call, the Court notes that controlled call does not contain any explicit admissions to the crime. However, the tone of the Defendant's voice, as well as of the context of the entire call, is certainly sufficient to support testimony that the Defendant made an [sic] tacit admission by having no surprised reaction to the fact that the police were asking the children if the Defendant ever touched them, asking "and?" to see what D.M. told the police, and asking D.M. to destroy evidence when the Defendant knew an investigation was ongoing. Thus, the Court finds that Detective Hunt's testimony describing that the Defendant did not make a full-on admission during of [sic] the controlled call is an accurate description of the Defendant's implicit admission and the Defendant was not prejudiced by any false testimony because the testimony was accurate.

The Court finds that, contrary to the Defendant's assertions that the controlled call is exculpatory, the tone and content controlled call is actually inculpatory. During the controlled call, the Defendant expresses no surprise when D.M. told the Defendant that police asked D.M. if the Defendant ever touched him, instead replying, "And?" (*See Exhibit C: p. 114, lines 7-13*). The Defendant asked D.M. to erase his phone call history to prevent the police from seeing how much D.M. called the Defendant. (*See Exhibit C: p. 115, lines 19-23*). Finally, the Defendant expresses no concern when D.M. explained that he hung up on the Defendant before because someone was coming. (*See Exhibit C: p. 115, lines 7-8*).

10

At the evidentiary hearing, the Defendant testified that he would have told the jury that he asked D.M. to erase the phone records to keep D.M. from getting in trouble. However, the Defendant's explanation is undermined by the controlled call when, after telling D.M. to erase his phone call history, the Defendant tells D.M. that he is glad he called, and specifically asks D.M. to keep calling. (*See Exhibit C: p. 115, line 25 - p. 116, line 1; p. 117, lines 3-6; p. 117, line 11*).

The Defendant fails to establish that he was prejudiced by Detective Hunt's testimony regarding the Defendant calling D.M. If jury had been properly informed that the Defendant, in the controlled call, said that it was D.M. had been calling the Defendant, there is no reasonable probability that the outcome of the trial would have been different. First, testimony remains from D.M.'s mother, Amy Dickerson, who testified that the Defendant called D.M. frequently towards the end of their relationship and she thought that it was the Defendant's son, J.H., who was calling her son, D.M. (*See Exhibit B: p. 340, lines 1-9*). Although D.M. told her that it was a private call and took the phone to his bedroom, she heard the voice over the phone and realized that it was the Defendant's voice. (*See Exhibit B: pp. 340-41*). J.H. testified that he never called D.M. because D.M. lived next door and it was easier to talk in person. (*See Exhibit B: p. 505, lines 12-22*). Moreover, the crux of the testimony regarding the controlled call was not who called who, but rather that the Defendant asked D.M. to erase his phone when the Defendant knew that the police were investigating him for allegations of sexual abuse against D.M. Given the request to conceal evidence, tacit admission, and tone of the call, there is no reasonable probability that the outcome of the trial would have been different if counsel had obtained the call and introduced it at trial. Therefore, Ground Four is denied.

\*\*\*

## Ground Ten - Ineffective Assistance for Failure to Request <u>Richardson</u> Hearing

The Defendant claims that counsel was ineffective for failing to request a <u>Richardson</u> hearing or object to improper <u>Williams</u> rule evidence when the State mentioned, during opening arguments, that the Defendant showed D.M. child pornography. (*See Exhibit B: p. 288, lines 8-11*). Alternatively, Defendant claims that counsel should have asked for a continuance to investigate the Defendant's computer and refute the claim.

11

*Summary of Evidentiary Hearing Testimony*

Dwight Wells testified that the [sic] D.M[.] was deposed twice and never mentioned that the Defendant showed him child pornography. (*See Exhibit C: p. 196, lines 7-12*).

Matthew Wells testified that he first became aware that the Defendant allegedly showed the victim child pornography during the State's opening statement, at which point Matthew Wells objected. (*See Exhibit C: p. 200, lines 12-25*). Matthew Wells testified that, had he known about this allegation before trial, he would have prepared differently for trial by hiring an expert to examine the Defendant's computer, and by deposing the State's expert on grooming. (*See Exhibit C: pp. 200-04*). Matthew Wells testified that he did not believe that the Court would have granted his request for a <u>Richardson</u> hearing because, based on the Court's prior rulings and its interaction at the bench conference, he did not have reason to believe that the Court would have ruled in his favor. Upon the Court's inquiry, Matthew Wells testified that he made a <u>Williams</u> rule objection because he believed that the State was improperly arguing that the Defendant had committed an uncharged, unsubstantiated criminal act. (*See Exhibit C: pp. 209-11*). Had Matthew Wells or his father known about the allegations before trial, they would have filed a motion in limine to exclude the testimony. If the testimony had been allowed, he would have hired a computer expert to refute the testimony before suggesting that the Defendant testify. (*See Exhibit C: p. 214, lines 1-16*). Matthew Wells testified that, at the bench conference, he told the Court that he was tempted to ask for a mistrial in order to gauge the Court's reaction before asking for a mistrial and, when the Court overruled the objection, Mr. Wells knew that a motion for mistrial would not be granted. (*See Exhibit C: p. 215, lines 2-21*). Mr. Wells then decided that he would argue in closing that there was no evidence to corroborate the State's allegation that the Defendant showed D.M. child pornography. (*See Exhibit C: pp. 215-16*).

The Defendant testified that he knew that D.M. watched pornography and that D.M.'s mother and sister caught him watching pornography. (*See Exhibit C: pp. 221-22*). The Defendant testified that Matthew Wells asked for a mistrial at counsel table and not at the bench, and that the jurors looked aghast. (*See Exhibit C: p. 222, lines 16-25*).

*Analysis of Ground Ten*

12

Based on the facts and circumstances presented in this case, the Court finds that counsel was not ineffective for failing to ask for a <u>Richardson</u> hearing or a continuance based on the allegation of the Defendant showing D.M. child pornography because, based on counsel's interactions with the Court, counsel reasonably believed that making such a motion would be a fruitless endeavor. <u>See</u> <u>Coleman v. State</u>, 64 So. 3d 1210, 1222 (Fla. 2011) (citing <u>Strickland</u>, 466 U.S. at 691). Counsel contemporaneously objected and, without specifically citing to the <u>Williams</u> rule, made a <u>Williams</u> rule objection and tested the idea of a mistrial to gauge the Court's reaction. (*See Exhibit B: p. 288, line 12 - p. 289, line 12).* When the Court overruled counsel's objection, he reasonably believed that the Court would not find in his favor upon a <u>Richardson</u> hearing or grant a mistrial. Thus, counsel began to develop a plan to argue that the allegation was unsubstantiated by any evidence.

Moreover, the Defendant has failed to establish that there is a reasonable probability that the outcome of the trial would have been different if counsel had asked for a <u>Richardson</u> hearing or continuance. The trial Court was not inclined to grant any continuances and, contrary to the Defendant's claim that the Court would have granted a <u>Richardson</u> hearing, Matthew Wells reasonably believed that the Court would not grant a hearing. Finally, the Defendant's claim that he was prejudiced because Mr. Wells asked for a mistrial at counsel table is without merit. The transcript corroborates Matthew Wells' credible testimony that the request was made at the bench. (*See Exhibit B: p. 288*). Considering that the Defendant has a prior felony conviction and has an obvious interest in these proceedings, the Court finds Matthew Wells' testimony to be more credible than that of the Defendant and finds that the request for the mistrial was made at the bench and not from counsel table such that the jury could hear the request. Therefore, Ground Ten fails both prongs of <u>Strickland</u> and is denied.

### Ground Fourteen - Ineffective Assistance of Counsel for Failing to Investigate Evidence and Failing to Move for a <u>Richardson</u> Hearing

The Defendant alleges that counsel was ineffective for failing to depose Detective Hunt or obtain a copy of the recorded interview Detective Hunt conducted with D.M. on April 28, 2011, and alleges that counsel should have objected and requested a <u>Richardson</u> hearing when Detective Hunt testified to the interview during trial. The Defendant alleges that he was prejudiced because counsel should have introduced the recorded interview to impeach

13

D.M. with D.M.'s admission that he lied to police, as well as introduce the fact that D.M. called A.D. a liar. Finally, Defendant contends that counsel should have impeached Detective Hunt or D.M. with what the Defendant characterizes as Detective Hunt threatening to have D.M. thrown in jail because he did not want to testify at trial. The Defendant concludes that, but for these errors, a reasonable probability exists that the outcome of the trial would have been different.

### Evidentiary Hearing Testimony as to Ground Fourteen

Dwight Wells testified that the State did not provide him with any additional discovery regarding Detective Hunt's April 28, 2011, interview with D.M. (*See Exhibit C: p . 238, lines 1-2*). Dwight Wells testified that, had he heard the interview before trial, it could have affected his trial strategy and he would have cross-examined Detective Hunt differently. (*See Exhibit C: p. 242, lines 6-17*). Dwight Wells indicated that he had trouble receiving discovery from the State. (*See Exhibit C: p. 245. lines 22-25*).

Matthew Wells testified that he was aware that the State had amended the charge to include capital sexual battery, but did not recall whether he ever received amended discovery indicating that Detective Hunt had interviewed D.M. and obtained new information to support the sexual battery charge. (*See Exhibit C: pp. 248-51*). Matthew Wells testified that, if he did not request a Richardson hearing, it was because he did not think it would be fruitful. (*See Exhibit C: p. 253, lines 10-17*).

The Defendant testified that, had he known the recorded interview before trial, he would have "pushed harder" to testify at trial in order to illustrate how D.M. lied. (*See Exhibit C: p. 265, lines 22-25*).

### Analysis of Ground Fourteen

Having considered the facts and circumstances presented in this case, the Court finds that counsel was not deficient for failing to depose Detective Hunt or obtain a copy of the April 28, 2011, recorded interview because the Court finds counsel's testimony that they did not receive the amended discovery and had ongoing difficulties receiving discovery from the State to be credible. The Court further finds that counsel was not deficient for failing to request a Richardson hearing because counsel's prior experiences leading up to trial caused them to reasonably believe that seeking such a hearing was not going to be fruitful. (*See Exhibit C: p. 253. lines 14-17; p. 178, line 4*).

14

At the parties' request, the Court listened to the recorded interview in its entirety after the evidentiary hearing to avoid unnecessarily prolonging the evidentiary hearing. During the recorded interview, Detective Hunt initially talks with D.M. about school, as well as D.M.'s cigarette and marijuana use. When D.M. expresses that he does not want to testify at trial, Detective Hunt jokingly tells D.M. that he could go to jail. The tone of the comment indicates that it was not a threat to D.M. and, to the contrary, carried on the friendly-banter tone Detective Hunt used when she jokingly admonished D.M. about smoking. Once Detective Hunt had spent a few minutes making small talk with D.M., she then asked D.M. about the new allegations that he had made to the State. D.M. admitted to Detective Hunt that he lied when did not initially tell police the entire truth and explains that he did not tell the entire truth because he wanted to protect the Defendant. D.M. explained that he came to feel differently about the Defendant because the Defendant "made me into something I wasn't," and "taught me stuff I didn't know." D.M. told Detective Hunt that he did not want to see the Defendant because seeing the Defendant brought back memories. Having listened to recorded interview, the Court finds that it is not exculpatory and there is no reasonable probability that the outcome of the trial would have been different if counsel had admitted the recorded interview during the trial.

The Court finds that the Defendant was not prejudiced by counsel's failure to introduce the recorded interview to impeach D.M. with D.M.'s admission that he lied to police because that testimony was introduced at trial. D.M. admitted that he did not initially tell police the complete story because he wanted to protect the Defendant, and Detective Hunt reiterated that D.M. did not tell her the complete story until her second interview with D.M. (*See Exhibit B: p. 310, lines 2-11; p. 442, lines 1-21*). Because this impeachment testimony was already presented to the jury, there is no reasonable probability that the outcome of the trial would have been different if counsel had presented cumulative impeachment evidence.

The Court further finds that the Defendant was not prejudiced by counsel's failure to introduce the fact that D.M. called A.D. a liar during the recorded interview because such a statement does not amount to character testimony and is, therefore, not admissible. See §§ 90.608, 90.609, Fla. Stat. (2011). Finally, the Court finds that the Defendant was not prejudiced by counsel failing to cross-examine Detective Hunt or D.M. with what the Defendant characterizes as Detective Hunt threatening to have D.M. thrown in jail because the tone and context of the recorded interview indicates that the

comment was not a threat. Therefore, the Court finds that the Defendant has failed to prove that he was prejudiced by counsel's failure to investigate and obtain the recorded interview and Ground Fourteen is denied.

(Doc. 9-2, Ex. 32 at 1777-1785) (footnotes omitted).

**A. Ground One, Subclaim A – Failure to request a *Richardson* hearing or move for a mistrial when the State introduced evidence that Mr. Henderson showed child pornography to D.M.**

The state post-conviction court's denial of this claim was reasonable. During the State's opening statement, the prosecutor said,

> You'll hear from [D.M.] and his mother that he didn't have a father in his life. So he started to think of this Defendant as his father figure, trust him, have a relationship with him, and he confided in this father figure that he's kind of curious about himself. Unfortunately, the Defendant's response to that is to sit him down in front of the computer and show him child porn involving little boys and –

(Doc. 9-2, Ex. 7 at 312). Defense counsel objected, and a bench conference ensued during which defense counsel argued the comment was not proper because it raised an issue that had "never been discussed before" and involved uncharged criminal acts (*Id.*, Ex. 7 at 312-13). Defense counsel also commented that he was "tempted to ask for a mistrial. . . ." (*Id.*, Ex. 7 at 312). After the prosecutor explained the reason she made her statement, the trial court overruled the objection (*Id.*, Ex. 7 at 313).

In determining defense counsel was not deficient in failing to move for a *Richardson* hearing or a mistrial at that time, the state post-conviction court essentially found counsel made a reasonable strategic decision. Counsel testified during the post-conviction evidentiary hearing that when he objected, he argued that the statement raised uncharged criminal

16

conduct and was a discovery violation, and stated he was considering moving for a mistrial (*Id.*, Ex. 30 at 1699-70). However, after the trial court overruled the objection, counsel determined the court likely would not grant either a *Richardson* hearing or a mistrial and therefore he decided to not move for either (*Id.*, Ex. 30 at 1700, 1706-07). Moreover, counsel preferred to not have a mistrial at that time (*Id.*, Ex. 30 at 1699). Rather, counsel decided to argue there was no evidence to support the assertion Mr. Henderson showed child pornography to the victim (*Id.*, Ex. 30 at 1714).

After the trial court overruled the objection to the prosecutor's comment about the child pornography, defense counsel reasonably concluded a motion for a *Richardson* hearing or a mistrial would be unsuccessful. Thus, defense counsel was not deficient in failing to make either motion because he was not required to make a futile motion. *See Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("an attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief"). Moreover, counsel made a reasonable strategic decision to forego a mistrial at that early stage of the trial and instead argue no evidence supported the prosecutor's statement. Such strategic decisions are virtually unchallengeable. *Day v. Sec'y, Fla. Dep't of Corr.*, 859 F. App'x 875, 879 (11th Cir. 2021) ("It is clearly established that strategic choices made after thorough investigation of law and facts relevant to plausible options are "'virtually unchallengeable.'" (quoting *Strickland*, 466 U.S. at 690)). Therefore, the state post-conviction court's determination that defense counsel was not deficient in deciding to not move for a *Richardson* hearing or a mistrial was not objectively unreasonable.

The state post-conviction court's finding there was no prejudice likewise was not objectively unreasonable. In finding Mr. Henderson failed to demonstrate prejudice, the state post-conviction court implicitly found had counsel moved for a *Richardson* hearing, the motion would have been denied. "[A]lthough the issue of ineffective assistance...is one of constitutional dimension," a court "must defer to the state's construction of its own law when the validity of the [ineffective-assistance] claim...turns on state law." *Pinkney,* 876 F.3d at 1295. Here, the state post-conviction court found that a *Richardson* hearing would not have been granted. Thus, the state court "already has told us how the issues would have been resolved under Florida state law had [counsel] done what [Mr. Henderson] argues [they] should have done." *Herring v. Sec'y. Dep't of Corr.*, 397 F.3d 1338, 1354-55 (11th Cir. 2005). This Court is bound to defer to that determination. Thus, this subclaim warrants no relief because Mr. Henderson fails to demonstrate either deficient performance or prejudice.

## B. Ground One, Subclaim B – Failure to investigate and request a *Richardson* hearing on a recorded phone call between victim D.M. and Mr. Henderson

The state post-conviction court's denial of this claim was reasonable. Initially, to the extent Mr. Henderson contends counsel were deficient in failing to request a *Richardson* hearing, the state post-conviction court denied the claim because the motion would have been "meritless" since the record revealed the prosecutor disclosed the recorded call (Doc. 9-2, Ex. 29 at 1333-34, 1336-37). The record supports the state post-conviction court's factual finding that the call was disclosed to defense counsel (*Id.*, Ex. 29 at 1352). Because the recorded call was disclosed, there was no discovery violation. Accordingly, defense counsel were not

18

deficient in failing to move for a *Richardson* hearing.

To the extent Mr. Henderson contends counsel were ineffective in failing to obtain the recorded call and introduce it at trial, the state post-conviction court found Mr. Henderson showed no prejudice. Detective Hunt testified that she recorded a call she had D.M. make to Mr. Henderson during which Mr. Henderson told D.M. he should erase all the information showing the calls Mr. Henderson made to D.M.'s phone because the police can "check those records." (*Id.*, Ex. 8 at 463-64). The recording of the call, played during the state post-conviction evidentiary hearing, revealed Mr. Henderson said, "Make sure you get rid of my number on there because they can always check and see -- they can check the phone records to see how often you've called." (*Id.*, Ex. 30 at 1612).

Had counsel introduced the recorded phone call at trial, it likely would have done Mr. Henderson more harm than good. Although the recording may have contradicted Detective Hunt's testimony to the extent she said Mr. Henderson told D.M. to erase the calls *Mr. Henderson made to D.M.* (rather than the calls D.M. made to Mr. Henderson),[5] the jury would have heard Mr. Henderson say, in his own words and while knowing the police were investigating him for sexual abuse of D.M., that D.M. should "get rid of my number" because "they can check the phone records to see how often" D.M. called him. And although Mr.

---

[5] Although subject to other interpretations, one reasonable interpretation of Mr. Henderson's statement, "Make sure you get rid of my number on there because they can always check and see -- they can check the phone records to see how often you've called[,]" is law enforcement can discover how often someone has called a telephone. Thus, Detective Hunt's testimony was not necessarily and inaccurate interpretation of Mr. Henderson's statement.

Henderson submits he told D.M. to erase the call history to protect D.M. from getting in trouble, a reasonable jury could have concluded Mr. Henderson instructed D.M. to erase the call history to conceal evidence. Moreover, to the extent Mr. Henderson argues Detective Hunt's testimony gave the jury the false impression he had been calling D.M., the jury heard from another witness, D.M.'s mother Amy Dickerson, that Mr. Henderson frequently called D.M., and D.M. would tell her the calls were "private" and would go to his bedroom to talk (*Id.*, Ex. 8 at 363-65). Thus, Mr. Henderson fails to demonstrate prejudice because he cannot "establish a reasonable probability that, but for counsel's [failure to investigate and introduce the recorded phone call], the outcome at trial would have been different." *Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1261 (11th Cir. 2014). Accordingly, this subclaim warrants no relief because Mr. Henderson fails to demonstrate either deficient performance or prejudice.

## C. Ground One, Subclaim C – Failure to object, move for mistrial, or request a *Richardson* hearing when Detective Hunt testified about a recorded interview of D.M.

The state post-conviction court's denial of this claim was reasonable. During direct examination at trial, the following exchange between the prosecutor and Detective Hunt occurred:

Q. Did you have an opportunity to speak with [D.M.]?

A. I did.

Q. What was the date of that?

A. On April 28th of this year, I did go out and speak with Damion again as he provided some additional information, additional what we call disclosures as

20

far as what had happened between himself and the Defendant.

Q. Okay. And where did you speak with him?

A. I spoke -- met him at his bus stop, and we spoke in my vehicle.

Q. And what did you speak about first? Did you go straight into the allegations or do you kind of do your thing?

A. I build rapport as I always would do. I spoke with him at length at this point. This was about the second or third time. It might have been the fourth time I spoke to Damion. So we were catching up. How is school? What have you been doing? What have you been doing after school? What are your grades? Things of that nature.

Q. So you're more familiar with him. He's more familiar with you?

A. Yes.

Q. What was his demeanor at this point?

A. He was more open than he was when I originally met him. He wanted to tell me that there's some things, that he didn't tell me all of what happened between himself and the Defendant originally. He told that he wanted to -- he felt like he needed to protect the Defendant in the beginning.

Q. He said that he used to feel like he had to protect the Defendant?

A. Yes.

Q. He didn't feel like that anymore?

A No. He wanted to tell everything that happened because he wanted to get past

it.

(Doc. 9-2, Ex. 8 at 465-66). During re-direct, Detective Hunt revealed that she "had digitally recorded that interview. . . ." (*Id.*, Ex. 8 at 476).

During the post-conviction evidentiary hearing, the court and parties listened to portions of the recorded interview which revealed the following conversation between D.M. and Detective Hunt:

MS. HUNT: It might get continued again and end up being in the summertime. But --

CHILD [D.M.]: (Indiscernible).

MS. HUNT: Why not?

CHILD [D.M.]: (Indiscernible).

MS. HUNT: You're not going to go to trial?

CHILD [D.M.]: No.

MS. HUNT: Oh, you're going to walk out of it? You can't. They'll throw you in jail. You're a witness and a victim. Why don't you want to testify?

CHILD [D.M.]: I didn't say I didn't. (Indiscernible).

MS. HUNT: Oh, you're not going to go during the summertime. But if it's during school time, it'll be fine?

CHILD [D.M.]: Yeah. (Indiscernible).

MS. HUNT: Oh, please. Three days out of your whole summer. Get real. And it's not even the whole day. Like, they'll start at, like, 10, finish at, like, 4.

(Indiscernible). You'll have so much summer left. (Indiscernible). It's only 8:30.

Umhum. Um-hum. I've got your number.

So the state attorney had called me and said that you had told her some things that you I guess didn't tell me, some other stuff that you thought about.

CHILD [D.M.]: I didn't tell anybody.

MS. HUNT: You didn't tell anybody? Okay.

CHILD [D.M.]: Actually, the last time when I went to the state attorney

MS. HUNT: Um-hum.

CHILD [D.M.]: (indiscernible), then I really didn't think of them

MS. HUNT: Um-hum.

CHILD [D.M.]: remember them (indiscernible).

MS. HUNT: Oh.

CHILD [D.M.]: I really forgot all about that.

MS. HUNT: Um-hum.

CHILD [D.M.]: (Indiscernible).

MS. HUNT: Um-hum. So you haven't seen them or anything?

CHILD [D.M.]: I haven't seen them.

MS. HUNT: All right.

CHILD [D.M.]: (Indiscernible).

MS. HUNT: Well, (indiscernible). Sometimes when you're young like that, they don't know the difference. But you're older; you know the difference, right?

That's why it's important for you to tell the truth.

\*\*\*

CHILD [D.M.]: -- the less information I gave.

MS. HUNT: And we talked about -- those are the things that I talked about with your mom. Okay. But you do recall that topic come up?

CHILD [D.M.]: For sure.

MS. HUNT: Okay. Do you recall oral every day? And that started you think when you were 11?

CHILD [D.M.]: A few months after I turned 11.

MS. HUNT: Three months after you turned 11? Okay. And what else do you remember?

CHILD [D.M.]: I remember we used to be kissing (indiscernible).

MS. HUNT: And was that -- where was that on your body? Where was he kissing you?

CHILD [D.M.]: On my lips.

MS. HUNT: On your lips. Anywhere else?

CHILD [D.M.]: (Indiscernible).

MS. HUNT: Anything else? So basically the bulk of it is that you just remember that it happened more frequently than you initially told me and that there was --

CHILD [D.M.]: I told you that it happened twice.

24

MS. HUNT: Right.

CHILD [D.M.]: Yeah. But I lied.

MS. HUNT: Um-hum. And he also placed his penis in your butt and the

opposite? I just want to make sure.

(Doc. 9-2, Ex. 1729-1733).

Mr. Henderson alleges the recording reveals D.M. admitted to lying and said he would

not testify, and Detective Hunt threatened to incarcerate D.M. if he refused to testify (Doc.

1-1 at 3). Mr. Henderson asserts the threat "prompted" D.M. to "alter his original story and

embellish his accounts," which allowed the State to charge Mr. Henderson with a capital

felony (*Id.*).  He claims the State suppressed the recording, and counsel were ineffective in

failing to object or move for either a mistrial or a *Richardson* hearing when Detective Hunt

testified about this interview with D.M. (*Id.*). He argues he was prejudiced because the

recording was exculpatory and could have been used to impeach both Detective Hunt and

D.M.

This subclaim can be denied because Mr. Henderson cannot show prejudice. First,

despite Mr. Henderson's assertion to the contrary, and as the state post-conviction court

found, almost nothing in the recorded interview is exculpatory (Doc. 9-2, Ex. 31 at 1729-

1733). Second, using the recorded interview to impeach D.M. with his statement that he

initially lied to the police would merely have been cumulative because D.M. testified that the

first time he spoke to the police, he did not tell them everything because he was trying to

protect Mr. Henderson (*Id.*, Ex. 8 at 334). Third, Mr. Henderson could not have used the

interview to impeach Detective Hunt because after listening to the recording, the state post-conviction court found Detective Hunt had not threatened D.M. Rather, the state post-conviction court found the recording revealed Detective Hunt was merely joking when she told D.M. they would throw him in jail if he did not testify. Mr. Henderson fails to rebut this factual finding with clear and convincing evidence. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2).").

Fourth and finally, even if counsel had moved for, and the trial court granted, a *Richardson* hearing, it is speculative whether the trial court would have found there was a discovery violation. The transcript of the post-conviction hearing reveals that although defense counsel testified that they never received information regarding the recorded interview, an exhibit revealed the interview was disclosed in a supplemental police report mailed by the State to defense counsels' correct address (Doc. 9-2, Ex. 31 at 1735-37, 1749, 1755-56). *See Rojas v. State*, 904 So. 2d 598, 600 (Fla. 5th DCA 2005) ("When a defendant claims that the State has violated the rules of discovery, the trial court must first determine whether there was a discovery violation.").

Mr. Henderson has failed his burden to demonstrate that the state court's denial of these claims was an unreasonable application of *Strickland* or based on an unreasonable

determination of the facts considering the evidence presented in the state court proceedings. Accordingly, Ground One warrants no relief.

**Ground Two: Trial counsel was constitutionally ineffective and prejudiced the Petitioner by failing to investigate and depose the only testifying law enforcement officer, and, therefore failed to impeach or properly cross examine the witness at all levels, leaving the State's version of events completely unchallenged. Counsel completely failed to engage the adversarial testing process rendering Petitioner's trial fundamentally unfair and the result unreliable. (Doc. 1-2)**

Mr. Henderson contends counsel were ineffective in failing to investigate and depose Detective Hunt. Had counsel deposed Detective Hunt, Mr. Henderson asserts, there is a "reasonable probability" counsel would have discovered the information that Mr. Henderson showed child pornography to D.M., the recorded phone call between D.M. and Mr. Henderson, and Detective Hunt's recorded interview of D.M. This information could have been used, according to Mr. Henderson, to reveal Detective Hunt threatened to incarcerate D.M. if he failed to testify and to argue D.M.'s "testimony was the product of alleged victim [A.D.'s] allegation that [D.M.] sexually assaulted him. . . ." (Doc. 1-2 at 1).

The state post-conviction court's denial of this claim was reasonable. The court found counsel was not deficient in failing to depose Detective Hunt because it found credible counsels' testimony that they never received information regarding the pornography, the recorded phone call, and the recorded interview from the State. The finding is supported by counsel's testimony during the evidentiary hearing (Doc. 9-2, Ex. 30 at 1616; Ex. 31 at 1688, 1698, 1707, 1735-36).

Mr. Henderson fails to show counsel were constitutionally required to depose

27

Detective Hunt to be reasonably effective. Counsel both testified they did not have the information regarding the child pornography or recorded call and interview. Attorney Matthew Wells said they likely did not depose Detective Hunt because they were not aware of her or because they did not know she had anything more to provide than "minor" or "tangential" information (Doc. 9-2, Ex. 30 at 1644-45). This was a poor judgment call by counsel, in hindsight. But it cannot be said that no competent counsel would have chosen not to depose Detective Hunt. *See Small v. Fla. Dep't of Corr.*, 470 F. App'x 808, 812 (11th Cir. 2012) (To demonstrate that counsel's decision was unreasonable, "the petitioner must show that no competent counsel would have taken the course of action that his attorney took." (citing *Blankenship v. Hall*, 542 F.3d 1253, 1273 (11th Cir. 2008))).

Even if counsel were ineffective in failing to depose Detective Hunt, Mr. Henderson fails to demonstrate sufficient prejudice. Mr. Henderson forms his ground on speculation, failing to set forth a sufficient basis for concluding that had counsel deposed Detective Hunt, there was any reasonable probability of a different outcome. First, it is purely speculative that deposing Detective Hunt would have revealed the information regarding the child pornography or the recorded phone call and statement.

Second, even if the information was disclosed during the deposition, Mr. Henderson cannot demonstrate a reasonable probability of a different outcome. He argues the recorded call could have been used to impeach Detective Hunt's testimony that Mr. Henderson told D.M. to erase the calls *Mr. Henderson made to D.M.* However, as discussed above, even though Mr. Henderson appeared to say during the recorded call that D.M. should erase *the calls D.M.*

28

*made to Mr. Henderson*, the damaging issue was not who was calling whom but Mr. Henderson telling D.M. to erase D.M.'s calls to Mr. Henderson when he knew he was being investigated for his sexual abuse on D.M. and A.D. Moreover, to the extent Mr. Henderson argues Detective Hunt's inaccurate testimony left the jury with the false impression Mr. Henderson was pursing D.M. by calling him, D.M.'s mother's testimony provided evidence that Mr. Henderson called D.M. multiple times.

Mr. Henderson also argues the recorded interview could have been used to impeach Detective Hunt because she threatened to incarcerate D.M. if he refused to testify and to impeach D.M. because he told Detective Hunt that when he first spoke to her, he had "lied" when he said the sexual acts with Mr. Henderson "happened twice" when it actually "happened more frequently." (See Doc. 9-2, Ex. 31 at 1730-33). But, as discussed above, the recorded interview could not have impeached Detective Hunt because, as found by the reviewing court, she was speaking lightly in jest when she said D.M. would be incarcerated if he failed to testify. And, at best, D.M.'s statement that he initially lied about how often the sex acts occurred would have been cumulative impeachment evidence because on direct examination D.M. admitted he initially did not tell the police everything to protect Mr. Henderson (See *id.*, Ex. 7 at 334).

To the extent Mr. Henderson asserts deposing Detective Hunt would have revealed D.M.'s allegation that Mr. Henderson showed him child pornography on Mr. Henderson's computer, Mr. Henderson was not charged with possessing child pornography, and the issue did not become a feature of the trial. There was brief mention of the pornography during the

State's opening and closing statements and less than one page of questioning by the State on the issue (*Id*., Ex. 7 at 288; Ex. 8 at 327-28; Ex. 9 at 527-28). And defense counsel argued during closing that if Mr. Henderson had child pornography on his computer, law enforcement would have seized the computer and searched it for child pornography (*Id*., Ex. 10 at 648).

Finally, even if some or all the information was revealed during Detective Hunt's deposition and had impeachment value, there was direct eyewitness testimony from D.M. and A.D. detailing the sexual acts Mr. Henderson performed with them. Considering their testimony, this Court cannot find that but for the alleged deficient performance there is a reasonable probability that the outcome of the trial would have been different. Thus, the state court's denial of this claim was neither an unreasonable application of *Strickland* nor based on an unreasonable determination of the facts in light of the evidence. Accordingly, Ground Two warrants no relief.

**Ground Three: Trial counsel was constitutionally ineffective and prejudicial by failing to investigate psychological evidence presented at trial, by failing to depose the State's testifying expert and by failing to obtain an expert to assist with defense preparations and rebuttal of the testifying psychologist's opinion and statistical assertions. Thereby counsel failed at all levels to meet the case of the State and engage the adversarial testing process. Counsel's deficiency and resulting prejudice rendered Petitioner's trial fundamentally unfair and the result unreliable. (Doc. 1-3)**

Mr. Henderson contends counsel were ineffective in the way they handled the State's expert psychologist, Dr. Crum. Specifically, he alleges counsel failed to: 1) investigate "psychological evidence"; 2) depose Dr. Crum; 3) cross-examine Dr. Crum; and 4) obtain a psychologist to "assist with defense preparation and rebut[]. . .the testifying psychologist's

30

opinion and statistical assertions." (Doc. 1-3 at 1). According to Mr. Henderson, Dr. Crum's testimony led "the jury to inferrences [sic] and conclusions based on no direct evidentiary basis." (Id.). Finally, Mr. Henderson contends the state post-conviction court was "unreasonable" in failing to hold an evidentiary hearing on this claim and in restating the claim he presented.

Initially, to the extent Mr. Henderson complains he was denied an evidentiary hearing, and the state court restated his claim, the claim is meritless. The Eleventh Circuit has clarified that, "while habeas relief is available to address defects in a criminal defendant's conviction and sentence, an alleged defect in a collateral proceeding does not state a basis for habeas relief." *Quince v. Crosby*, 360 F.3d 1259, 1262 (11th Cir. 2004). Accordingly, Mr. Henderson cannot obtain relief based on the state post-conviction court's denial of this claim without an evidentiary hearing. Also, a review of this record shows this claim was not unfairly represented by the reviewing court or Respondent. (*See* Doc. 9-2, Ex. 26 at 1069–1072).

In denying Mr. Henderson's ineffective assistance claim, the state post-conviction court stated:

> In ground six, Defendant claims that counsel failed to investigate "available data from newer studies and reliable sources" to impeach Doctor Crum, the State's expert witness, including possibly hiring his own expert witness. Specifically, Defendant cites to the type of evidence considered in *Harrison v. State*, 33 So. 3d 727, 731 (Fla. 1st DCA 2010), or *Barkell v. Crouse*, 468 F.3d 684, 698-699 (10th Cir. 2006). Defendant claims that if counsel had introduced this evidence, there is a strong probability that the jury would have found him not guilty.
>
> Defendant is not entitled to relief because his claim is pure speculation. *See Bass*, 932 So. 2d at 1172. In *Barkell*, the defendant provided a report from an

31

independent expert, and the Tenth Circuit found that counsel was not ineffective for failing to call the expert because that expert did not disagree with the state's expert. *Barkell*, 468 F.3d at 698-699. In contrast, Defendant has alleged only that counsel might have found an expert who could have given beneficial testimony or evidence if counsel had investigated "available data." Defendant cites to *Harrison*, but does not allege that the expert in *Harrison* was available to testify at Defendant's trial or that a similar expert would have been available. Further, the expert in *Harrison*'s testimony, although not described in detail in the opinion, may not have been applicable in Defendant's case. *Harrison* concerned an eleven-year-old victim testifying to events that happened when she was three or four. 33 So. 3d at 728-729. Both of Defendant's victims were older and testified to more recent events. (*Exhibit B* at 298, 300:25, 306-307, 368, 378:10). As Defendant's assertion that an expert could provide testimony that impeached Doctor Crum is speculation, ground six is denied.

(Doc. 9-2, Ex. 27 at 1110-1111).

The state post-conviction court's denial of this claim was reasonable. The entire claim relies on the premise that counsel should have retained a psychologist who would have helped counsel prepare for Dr. Crum's testimony and would have rebutted Dr. Crum's testimony. The burden of establishing prejudice under *Strickland* "is particularly heavy where the petitioner alleges ineffective assistance in failing to call a witness because often allegations of what a witness would have testified to are largely speculative." *McKiver v. Sec'y, Fla. Dep't of Corr.*, 991 F.3d 1357, 1365 (11th Cir. 2021). For that reason, "a petitioner's own assertions about whether and how a witness would have testified are usually not enough to establish prejudice from the failure to interview or call that witness." *Id*. The record shows that Dr. Crum's testimony was not extensive and not tied to the victims specifically. Defense counsel did not view Dr. Crum as damaging at trial and did not cross-examine him. The Court agrees. Dr. Crum was not a significant cause of the convictions. The reviewing post-conviction court,

moreover, made a reasonable conclusion that there is no basis to conclude that a trial-ready expert would have provided helpful testimony. The state court reasonably rejected Mr. Henderson's ineffective-assistance claim as "pure speculation." *See Duran v. Walker*, 223 F. App'x 865, 875 (11th Cir. 2007) ("[Petitioner's] claim that an expert witness would have prompted the jury to believe his testimony...is conclusory and speculative, and does not amount to a showing of prejudice.").

The state court's denial of this claim was neither an unreasonable application of *Strickland* nor based on an unreasonable determination of the facts in light of the evidence. Accordingly, Ground Three warrants no relief.

**Ground Four: Trial counsel [were] constitutionally ineffective and prejudiced Petitioner's trial by failing to ensure Petitioner's constitutional right to testify in his own behalf. Counsel failed at all levels to prepare Petitioner to testify, effectively leaving him no choice but to acquiesce to counsel[s'] failure at admitting relevant material evidence rendering Petitioner's trial fundamentally unfair and the verdict unreliable. (Doc. 1-4)**

Mr. Henderson contends counsel were ineffective for not preparing him to testify. As a result, he claims he had no choice but to not testify. He asserts that without his testimony, the jury never heard: 1) about his relationship with victim A.D.'s mother and how her "contentious nature" caused him to seek counseling with his pastor who advised him to end the relationship; 2) that A.D.'s accusation D.M. sexually assaulted him was a consensual encounter for which both boys were "chastised," and D.M. was prohibited from going to Mr. Henderson's home; and 3) that Mr. Henderson had "tattoos on his body[, including his penis,] that are located in plain view [even] if [he was only] partially unclothed." (Doc. 1-4 at 1-2).

In denying this claim,[6] the state post-conviction court stated:

> The Defendant alleges that counsel was ineffective for misadvising him to not testify on his own behalf. Specifically, the Defendant contends that counsel (a) failed to prepare him to testify and (b) counsel's advice to not testify was unreasonable. The Defendant alleges that he decided not to testify during the Court's colloquy because counsel had asked him to do whatever the judge asked of the Defendant and he was under a great deal of stress. The Defendant alleges that, had he testified, he would have testified to his relationship with A.D.'s mother, that D.M. and A.D. engaged in sexual acts with each other, that A.D. habitually lied, that D.M. had mental illnesses, and that the Defendant had tattoos on his body of which the victims were unaware.

*Summary of Evidentiary Hearing Testimony*

> Cary Gershowitz, a former roommate of the Defendant's who had known the Defendant for thirty years, testified that the Defendant had a rose tattoo on his arm and a "yin and yang" tattoo on his chest or torso. (*See Exhibit C: March 16, 2018, Motion for Postconviction Relief Transcript, p. 11, lines 9-17*). Mr. Gershowitz testified that the Defendant may have a star tattoo, but he did not remember it clearly enough to be able to testify to the location of the star tattoo. (*See Exhibit C: p. 13, lines 5-10*).

> Attorney Dwight Wells testified that he became the Defendant's attorney approximately nine months before the trial date. Mr. Wells told the Defendant on June 16, 2011, that he would be gone for the summer and fall, but Mr. Wells' son, Attorney Matthew Wells, would handle the case in Dwight Wells' absence. (*See Exhibit C: p. 16, lines 2-20*). Dwight Wells visited the Defendant on October 24, 2011, and November 17, 2011, leaving the state briefly after each visit, and returned the day before trial. (*See Exhibit C: p. 17, lines 3-19*). Dwight Wells admitted that he did not spend any time preparing the Defendant to testify or for cross-examination and advised the Defendant to not testify. (*See Exhibit C: p. 19, lines 3-18*). Dwight Wells testified that he did not believe that the

---

[6] In his second amended 3.850 motion, Mr. Henderson also alleged counsel failed to advise him he had a constitutional right to testify (Doc. 9-2, Ex. 26 at 1081-1087). He makes no such claim in his federal habeas petition. And even if he did make the claim, it would fail because both his attorneys testified at the evidentiary hearing that they told him he had a right to testify, and it was his decision whether to testify (*Id.*, Ex. 30 at 1529, 1538). Moreover, during trial Mr. Henderson told the court he understood he had the right to either testify or not testify, and the decision was his (*Id.*, Ex. 10 at 601-02).

Defendant told him that he had a tattoo on his penis, then clarified his testimony to reflect that he did not know whether the Defendant told him that he had a tattoo on his penis. (*See Exhibit C: pp. 24-25*).

On cross-examination, Dwight Wells explained that he advised the Defendant not to testify because, in his thirty-seven years' experience, he felt that the exposure to cross-examination would not have been worth what the Defendant would have testified to, especially considering that there were other witnesses who could have testified to what the Defendant wished to testify to. (*See Exhibit C: pp. 29-30*). Dwight Wells explained his trial strategies to the Defendant, told the Defendant that the decision whether to testify was the Defendant's decision, and did not force or coerce the Defendant into deciding not to testify. (*See Exhibit C: p. 32, lines 1-20*). Dwight Wells discussed the concept of the Defendant testifying and knew that the Defendant wished to deny the charge and explain that his relationship with A.D.'s mother had gone sour, but drew out that testimony through A.D.'s mother and the Defendant's son. (*See Exhibit C: pp. 37-38*). Upon the Court's inquiry, Dwight Wells clarified his testimony that he did not recall whether the Defendant told him about a distinguishing feature on his body, but that is something that he would recall if he were told. (*See Exhibit C: p. 42, lines 13-20*).

Attorney Matthew Wells, Dwight Wells' son who has been an attorney since 1997 and tried approximately fifty murder and capital sexual battery cases to verdict, assisted in representing the Defendant during the summer of 2011. (*See Exhibit C: pp. 48-49*). Matthew Wells did not spend any time preparing the Defendant to testify and advised him to not testify. (*See Exhibit C: p. 51, lines 2-9*). Matthew Wells explained that he knew that the Defendant wished to testify to tell the jury that he did not commit the crime, but that he did not feel that was necessary because the Defendant was presumed innocent and he was concerned that a seasoned prosecutor would cross-examine the defendant. (*See Exhibit C: pp. 53-54*). Matthew Wells asked the Defendant to answer the Court's questions as nicely as possible. (*See Exhibit p. 55, lines 15-25*). Matthew Wells recalled the Defendant telling him about tattoos, was not sure whether the Defendant specifically told him that he had a tattoo on his penis, but was under the impression that the Defendant had a tattoo in an area that would not be seen unless the Defendant was naked. (*See Exhibit C: p. 60, lines 1-7*).

On cross-examination, Matthew Wells testified that, from a strategic standpoint, he felt that he could stand in front of the jury and argue that the Defendant was innocent and that the victims were not credible without putting the Defendant on the stand to refute their testimony and exposing the

Defendant to cross-examination by the State, including cross-examination on the issue of the Defendant towel-drying the victims after the shower. (*See Exhibit C: p. 64, line 16 - p. 65, line 16*). Matthew Wells advised the Defendant that he had a right to testify, and did not force or coerce the Defendant to answer the Court's questions in a particular way, but did encourage the Defendant to be polite and to-the-point with the Court. The Defendant's prior interactions with the Court had, according to Matthew Wells, not turned out well and Matthew Wells did not want to create any additional issues during trial. (*See Exhibit C: p. 66, lines 7-23*). Upon the Court's inquiry, Matthew Wells clarified that part of his concern with the Defendant testifying was that the State could ask questions that would draw the jury's attention to tangential matters that the jury might not have otherwise focused on, he had discussed the idea of the Defendant testifying with his co-counsel, Dwight Wells, and they both agreed that the Defendant should not testify. (*See Exhibit C: pp. 73-75*).

The Defendant testified that, had he been able to testify at trial, he would have testified that he had a sexual relationship with A.D.'s mother Caralyn O'Donnell which turned into a financial relationship where she would help pay the bills while he babysat her children. The Defendant believes that Ms. O'Donnell had a vendetta against him. (*See Exhibit C: pp. 85-91*). The Defendant would have testified that he walked in on A.D. and D.M. engaging in sexual activity and that D.M. came over to the Defendant's house because he was upset that his mother caught him looking at gay websites. (*See Exhibit C: p. 94, lines 6-25*). The Defendant testified that his attorneys did not prepare him for trial. (*See Exhibit C: pp. 98-99*). The Defendant testified that he has a tattoo on his right shoulder with the word "mom" and a diamond. He testified that he has a tattoo of a yin and yang and a star on his left chest, and has had tattoos on his left forearm since he was twelve years old. (*See Exhibit C: pp. 99-100*). The Defendant testified that the initials of his child's mother are tattooed on his penis. (*See Exhibit C: p. 100, lines 1-4*). The Defendant testified that he told counsel about all of his tattoos, including the tattoo on his penis. (*See Exhibit C: p. 101, lines 21-25*).

*Analysis of Ground Fifteen*

When a defendant alleges that counsel misadvised him not to testify at trial, the court must consider whether: 1) the defendant voluntarily agreed not to take the stand, and 2) no reasonable attorney would have discouraged the defendant from testifying. *See Simon v. State*, 47 So. 3d 883, 885 (Fla. 3d DCA 2010). Having considered the evidentiary hearing testimony, along with the totality of the facts of and circumstances in this case, the Court finds that Ground 15 fails both prongs of *Strickland* because counsel was not ineffective

for misadvising the Defendant not to testify and there is no reasonable probability that the outcome of the trial would have been different if the Defendant had testified.

The Court finds that the colloquy with the Defendant indicates that the Defendant voluntarily agreed to not take the stand. (*See Exhibit B: pp. 573-75*). While the Defendant alleged that counsel asked him to do whatever the Court asked, both Matthew and Dwight Wells testified that they told the Defendant that it was the Defendant's decision whether to testify and only asked the Defendant to be polite and brief when he interacted with the Court. (*See Exhibit C: p. 32, lines 1-20; p. 66, lines 7-23*). Asking the Defendant to be polite and direct when answering the Court's questions does not amount to coercing the Defendant to not testify. Thus, the Court finds that the Defendant's decision not to testify was voluntary.

The Court further finds that counsel's advice to not testify was reasonable and was based in sound trial strategy designed to avoid exposing the Defendant to cross-examination only to testify to facts that other individuals could and did testify to. The Defendant contends that he would have denied committing the offenses; however, as Matthew Wells noted, the presumption of innocence permitted Mr. Wells to tell a jury that the Defendant was innocent. The Defendant contends that he would have testified that Caralyn O'Donnell was making up the allegations because they fought and she had a vendetta against him, but Ms. O'Donnell testified that she had a romantic-turned-financial relationship with the Defendant and that they had fought. (*See Exhibit B: p. 404, lines 6-25; p. 412, line 7-9; p. 414, lines 14-24; pp. 416-17*). Additionally, on cross-examination, A.D. testified that the Defendant had made his mother (Ms. O'Donnell) sad. (*See Exhibit B: pp. 380-81*). The Defendant wished to testify that D.M. and A.D. engaged in sexual acts with each other; however, A.D. testified to that. (*See Exhibit B: p. 393, lines 11-19*). The Defendant wished to testify that that A.D. habitually lied; however, there was no evidence of that introduced during the evidentiary hearing and, without any concrete reputation evidence, such testimony would not have been inadmissible opinion. See § 90.609, Fla. Stat. (2009). The Defendant wished to testify to D.M.'s mental illnesses; however, trial testimony regarding D.M.'s mental illnesses was excluded via an order *in limine*. (*See Exhibit B: p. 93, lines 16-19*). Because counsel did introduce the admissible testimony through means other than by the Defendant in their effort to introduce the testimony without exposing the Defendant to cross-examination, the Court finds that there is no reasonable probability that the outcome of the trial would have been different if the Defendant had testified to these facts himself.

Finally, the Defendant wished to testify to the tattoos on his body, especially the tattoo on his penis, and contends that he was prejudiced because, by not testifying as to his tattoos, he lost the ability to impeach A.D. and D.M.'s testimony. Dwight Wells could not remember whether the Defendant told him about the tattoos, but believed he would have remembered if the Defendant had told him about a tattoo on his penis. (*See Exhibit C: p. 42, lines 13-20*). Matthew Wells remembered the Defendant telling him something about a tattoo, but was not sure whether the Defendant specifically told him about a tattoo on his penis. (*See Exhibit C: p. 60, lines 1-7*). Assuming that the Defendant did tell one or both attorneys that he had a tattoo on his penis, the Court cannot conclude that there is a reasonable probability that the outcome of the trial would have been different if the Defendant had testified.

The Defendant, notably, did not testify to the size, location, color, or visibility of the tattoo on his penis and, unlike the other tattoos on his body, did not demonstrate that the tattoo is actually present other than by his sworn testimony. The credibility of the Defendant's testimony is impeached by his prior felony conviction and by his interest in having his conviction reversed. Thus, there is no credible evidence before the Court to establish that the tattoo is something that a person necessarily would have seen if they had been engaged in a sexual act with the Defendant. Additionally, the Defendant's proposed testimony would not have directly impeached D.M.'s testimony because, when asked whether he saw any scars, tattoos, or marks on the Defendant's body, D.M. testified, "not that I can remember." (*See Exhibit B: p. 331, lines 16-19*). D.M., notably, did not testify that there were no tattoos on the Defendant's body such to be squarely impeached with evidence of tattoos on the Defendant's body.

Even if A.D. had been asked about tattoos on the Defendant's penis and testified that he saw no tattoos on the Defendant's penis, the Defendant's proposed testimony would not have necessarily impeached A.D.'s testimony because there is nothing to indicate that the tattoo is visible such that A.D. would have noticed the tattoo when he saw the Defendant engaging in sexual acts. Accordingly, the Defendant has failed to establish that there is a reasonable probability that the outcome of the trial would have been different if he had testified to his tattoos. Therefore, Ground Fifteen (a-b) fails both prongs of *Strickland* and is denied.

(*Id.*, Ex. 32 at 1785-1790).

The state post-conviction court's denial of this claim was reasonable. To the extent Mr. Henderson alleges he had "no choice but to" not testify because counsel failed to spend time with him preparing for his testimony, he essentially is alleging, as he did in his state post-conviction proceedings, that his decision to not testify was involuntary. However, the state post-conviction court found Mr. Henderson's "decision not to testify was voluntary[,]" and that finding is supported by the record.

At trial, counsel informed the trial court he had spoken "at length" to Mr. Henderson that morning about whether he would testify, and Mr. Henderson "advised [him] that he would like to exercise his right not to testify." (Doc. 9-2, Ex. 9 at 601). During the ensuing colloquy regarding his right to testify, Mr. Henderson stated he understood he had a right to testify or not to testify, and that it was his decision to make (*Id.*, Ex. 9 at 601-02). He affirmed no one had threatened or coerced him to not testify, and no one had promised him anything about the outcome of the trial if he decided not to testify (*Id.*, Ex. 9 at 602-03). He also affirmed he was "satisfied" he had sufficient time to discuss the decision with his attorneys, and he had no "confusion whatsoever about the decision" to not testify (*Id.*, Ex.9 at 602-03).

During the post-conviction evidentiary hearing, counsel testified they advised Mr. Henderson he had a right to testify, and that it was his final decision whether to testify (*Id.*, Ex. 30 at 1529, 1538, 1562-63, 1566). On multiple occasions, Mr. Henderson expressed to counsel he wanted to testify (*Id.*, Ex. 30 at 1533-34, 1549). However, both attorneys discussed the "risks" and "benefits" of testifying with Mr. Henderson and strongly advised him to not testify (*Id.*, Ex. 30 at 1534, 1541, 1548, 1566). Counsel believed that telling Mr. Henderson

about another case in which his client wanted to testify, but counsel advised the client to not testify and he was acquitted helped Mr. Henderson decide to not testify (*Id.*, Ex. 30 at 1549-1550). Although Mr. Henderson still seemed hesitant about not testifying, he seemed to have confidence in counsel and "acquiesced to [their] advice[.]" (*Id.*, Ex. 30 at 1551-1552).

"Defense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide." *United States v. Teague*, 953 F.2d 1525, 1533 (11th Cir. 1992) (footnote omitted). "Moreover, if counsel believes that it would be unwise for the defendant to testify, counsel may, and indeed should, advise the client in the strongest possible terms not to testify. The defendant can then make the choice of whether to take the stand with the advice of competent counsel." *Id.* Here, the record reveals that Mr. Henderson decided to not testify after counsel and the trial court advised him of his right to testify or not to testify and that the decision was his to make, after counsel discussed the pros and cons of testifying with Mr. Henderson, and after counsel advised him in no uncertain terms to not testify. Thus, the state post-conviction court's finding that Mr. Henderson's decision to not testify was voluntary was reasonable. Accordingly, Mr. Henderson's claim that his decision was involuntary because counsel did not prepare him to testify warrants no relief.

Mr. Henderson's claim that counsel misadvised him to not testify likewise warrants no relief. Choosing which witnesses to call "is the epitome of a strategic decision, and it is one that ... will seldom, if ever, [be] second guess[ed]." *Rhode v. Hall*, 582 F.3d 1273, 1284 (11th Cir. 2009). "Even if in retrospect the strategy appears to have been wrong, the decision

will be held ineffective only if it was so patently unreasonable that no competent attorney would have chosen it." *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983) (citations omitted).

During the post-conviction evidentiary hearing, counsel explained that they advised Mr. Henderson to not testify because "his exposure to cross-examination would not be worth what he would have testified to[,]" and they "had witnesses that [they] could call. . .[who] would have testified to certain things without him having to testify." (Doc. 9-2, Ex. 30 at 1527). Counsel believed the State "had a pretty strong case," and in their experience it was better to not call the defendant to testify when the State had "a strong case." (*Id.*, Ex. 30 at 1530-1531). Counsel were concerned that considering some of Mr. Henderson's history with the judge and the prosecutor, the "prosecutor could get under his skin a little bit, get him off a little bit, get him to display some behavior that might [have] been detrimental [before] the jury." (*Id.*, Ex. 30 at 1551, 1560). Moreover, counsel were concerned that if Mr. Henderson testified, the State would bring up "tangential matters. . .that would not help the defense. . . ." (*Id.*, Ex. 30 at 1571). And although one of Mr. Henderson's attorneys testified that had he known about Mr. Henderson's tattoos he would have recommended Mr. Henderson testify (*id.*, Ex. 30 at 1542), his other attorney testified he knew about Mr. Henderson's tattoos, considered that fact, and still recommended Mr. Henderson not testify (*Id.*, Ex. 30 at 1556-1559). Notably, Mr. Henderson had a prior felony conviction (*Id.*, Ex. 40, 1971).

Considering counsels' testimony, the state post-conviction court's decision that counsel were not deficient in advising Mr. Henderson to not testify was reasonable. Counsel

41

were seasoned litigators who, based on their trial experience, believed that the value of Mr. Henderson's testimony was not worth his exposure to cross-examination. *See Teague*, 953 F.2d at 1533 n.9 ("There are good tactical reasons why it may not be best for the defendant to testify in some circumstances. Some examples might be if the defendant might provide evidence of missing elements of the crime on cross-examination, if the defendant might be prejudiced by revelation of prior convictions, or if the prosecutor might impeach the defendant using a prior inconsistent statement."); *Maharaj v. Sec'y Dep't Corrs.*, 432 F.3d 1292, 1319 (11th Cir. 2005) ("The tactical decision to advise petitioner against testifying because of the dangerous cross-examination that could ensue was utterly unaffected by the truth or falsity of the [newspaper] articles [about his outstanding warrants] and cannot be a sound basis for a claim of ineffective assistance of counsel."); *Chandler v. United States*, 218 F.3d 1305, 1316 (11th Cir. 2000) ("When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger."). That was especially true here where other witnesses could testify to what Mr. Henderson wished to testify about, and the information also could be revealed on cross-examination. *See Preston v. Sec'y Dep't of Corr.*, 745 F. App'x 835, 838 (11th Cir. 2018) ("[E]ven if counsel had misadvised Preston, he has not established — as he must — that there is no 'reasonable argument' that he did not suffer prejudice as a result. The facts that Preston says he would have testified to in order to support his claim of self-defense were largely duplicative of the balance of the evidence at trial.").

Mr. Henderson asserts he would have testified about his extensive and contentious

relationship with A.D.'s mother, Caralyn O'Donnell. But that testimony essentially would have been cumulative of A.D.'s testimony that Mr. Henderson was dating his mother and made his mother sad (*id.*, Ex. 8 at 393, 404-05), and Ms. O'Donnell's testimony that she was dating Mr. Henderson and paying his bills, the relationship deteriorated, and they had a big fight when she stopped paying his bills after which she never spoke to him again (*Id.*, Ex. 8 at 426, 434-39, 454).

Mr. Henderson also asserts he would have testified that A.D.'s claim that D.M. had sexually assaulted A.D. in Mr. Henderson's apartment (*see id.*, Ex. 8 at 417-419), was actually a consensual encounter between A.D. and D.M. However, he fails to explain how the testimony would have been admissible, considering Florida's rape shield statute. *See* Fla. Stat., § 794.022 (2) ("Specific instances of prior consensual sexual activity between the victim and any person other than the offender may not be admitted into evidence in a prosecution under s. 787.06, s. 794.011, or s. 800.04. . . ."). And even if admissible, he fails to explain how this testimony would have changed the outcome.

Finally, when D.M. was asked whether he ever saw any scars or tattoos on Mr. Henderson's body, he answered, "not that I can remember." (Doc. 9-2, Ex. 8 at 355). This testimony, Mr. Henderson contends, would have been contradicted by Mr. Henderson either showing or testifying about his tattoos, including one on his penis. He argues no reasonable juror would have believed the victims' allegations after seeing or hearing about his tattoos because the victims would have seen the tattoos during the alleged sexual acts.

Despite knowing about Mr. Henderson's tattoos and considering the tattoos may not

be revealed to the jury if Mr. Henderson did not testify, Attorney Matthew Wells still believed the benefit of calling Mr. Henderson to testify was outweighed by his exposure to cross-examination and the possibility the prosecutor would agitate Mr. Henderson on the stand. Accurate or not, those are the types of strategic considerations *Strickland* insulates from hindsight review. And there were other good reasons his attorneys may have had for advising him to not take the stand, including the jury would learn he was a convicted felon. Three witnesses testified they were frequently at Mr. Henderson's apartment when the victims also were there, and they saw no inappropriate sexual acts between Mr. Henderson and the victims. Thus, reasonable counsel could have concluded that Mr. Henderson's testimony wasn't worth the risks.

Mr. Henderson has failed his burden to demonstrate that the state court's decision is an unreasonable application of clearly established Federal law or was based on an unreasonable determination of the facts, given the evidence in the state court proceeding. Therefore, relief is not warranted on Ground Four.

**Ground Five: Counsel was constitutionally ineffective and prejudiced Petitioner by failing to convey a plea offer by the State or otherwise consult with Petitioner in regards to plea discussions after relating to the Petitioner that the State would not consider anything below the minimum 25 year guideline sentence. (Doc. 1-5 at 1).**

Mr. Henderson contends that Attorney Donald O'Leary, one of the defense attorneys who represented him pre-trial, was ineffective in not conveying the State's plea offer of a 10-year sentence.[7] This claim was raised in state court in Mr. Henderson's Second or Successive

---

[7] Mr. Henderson's claim that counsel was ineffective in failing to "otherwise consult with [him] in

Motion for Post-Conviction Relief under Rule 3.850, Fla.R.Crim.P. (Doc. 9-2, Ex. 40) that Mr. Henderson alleged was based on newly discovered evidence of the 10-year offer. The state post-conviction court dismissed the motion as untimely (*Id.*, Ex. 41 at 1976). In the alternative, the state post-conviction court stated that even if the Rule 3.850 motion was timely, it would fail on the merits because the State's notes indicated defense counsel asked the State if it would accept a 10-year offer, and the trial transcript showed the State was not willing to accept any plea offers (*Id.*, Ex. 41 at 1976).

Because the state post-conviction court dismissed the claim as untimely, Respondent argues the claim is "procedurally defaulted on habeas review." (Doc. 9 at 37). The Court agrees. The state post-conviction court dismissed this claim because it found that it was untimely, as Mr. Henderson first raised it in his successive Rule 3.850 motion, and it did not qualify for the exception for newly-discovered evidence because he could have made the public records request for the State's notes within two years after his judgment of conviction became final. Because the state court's rejection of this claim as untimely was based on an independent and adequate state ground, *see Castro v. Everglades Corr. Inst.*, 481 F. App'x 560, 562 (11th Cir. 2012) (state court's denial of federal habeas petitioner's claim of ineffective assistance of counsel because petitioner's state post-conviction motion raising the issue was untimely constituted independent and adequate ground of state law for denying the claim),

---

regards to plea discussions after relating to [him] that the State would not consider anything below the minimum 25 year guideline sentence," is supported by no facts and therefore denied as vague and conclusory. *See Wilson v. United States*, 962 F.2d 996, 998 (11th Cir. 1992) ("Conclusory allegations of ineffective assistance are insufficient.") (citation omitted).

the claim is likewise procedurally defaulted in this Court. *See Bailey v. Nagle*, 172 F.3d 1299, 1302 (11th Cir. 1999) (holding that, if a state court finds that a petitioner's claims are procedurally defaulted after applying an adequate and independent state law, a federal court must respect the state court's decision). And in the situation, as here, "where a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim." *Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir. 1994).

Mr. Henderson seeks to excuse the default under *Martinez v. Ryan*, 566 U.S. 1 (2012). *Martinez* held that a petitioner may establish cause for the default of a claim of ineffective assistance of trial counsel where (1) "in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective," and (2) the defaulted claim is a "substantial one," meaning that "the claim has some merit." *Martinez*, 566 U.S. at 14, 17. A petitioner shows that his defaulted claim is "substantial" under *Martinez* by demonstrating that "reasonable jurists 'would find it debatable whether the petition states a valid claim of the denial of a constitutional right.'" *Clark v. Comm'r, Ala. Dep't of Corr.*, 988 F.3d 1326, 1331 (11th Cir. 2021) (quoting *Hittson v. GDCP Warden*, 759 F.3d 1210, 1269-70 (11th Cir. 2014)).

*Martinez* does not excuse the default of Ground Five because the underlying ineffective-assistance claim is not "substantial." *Martinez*, 566 U.S. at 14. Mr. Henderson has provided no evidence, other than his conjecture that the prosecutor's notation "What are guidelines? What about an offer of 10 yrs?" during a phone conversation with defense counsel establishes the State extended a 10-year offer to Mr. Henderson, to support his claim that

46

counsel failed to convey a 10-year offer from the State. Thus, this claim is speculative and therefore insufficient to warrant relief. *See Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (recognizing that vague, conclusory, speculative, or unsupported claims cannot support an ineffective assistance of counsel claim).[8] Accordingly, Mr. Henderson's claim is not substantial under *Martinez*, and Ground Five is barred from federal habeas review.

The Court has addressed all claims and subclaims.

## IV. Conclusion

Hindsight demonstrates a number of improvident choices made by Mr. Henderson's counsel. In the Court's view, Mr. Henderson is serving a life sentence after receiving a defense that was mediocre at best. The Court nevertheless finds itself constrained by the doubly deferential standard imposed by the juxtaposition of *Strickland* and the AEDPA. *See Richter*, 562 U.S. at 105. Under this standard, Mr. Henderson is entitled to no relief.

Accordingly, it is hereby **ORDERED** and **ADJUDGED**:

1. The petition (Doc. 1) is **DENIED**. The Clerk must enter judgment against Mr. Henderson and close this case.

2. A Certificate of Appealability ("COA") is **GRANTED**, in part and **DENIED**, in part. A COA is granted as to Ground One and Ground Two. *See Miller–El v. Cockrell*, 537 U.S. 322, 327 (2003) (A COA is warranted if "jurists of reason could disagree with the district

---

[8] *See also* Ex. 41 at 1993 (Mr. Henderson stating that "there is no plea bargain that would be amicable to the State" in response to the trial court informing him that this "would essentially be your last opportunity" to reach a deal).

court's resolution of [a petitioner's] constitutional claim or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.") (citation omitted). A COA is denied as to the remaining claims.

**DONE AND ORDERED** at Tampa, Florida, on March 28, 2024.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record
Petitioner, *pro se*

48